CHRISTOPHER R. HART #10658
JONATHAN D. HART #16469
HART & HART, P.C.
631 N. 300 W.
Salt Lake City, UT   84103
Telephone: (801) 534-1100
Facsimile: (801) 534-1559
chris@hartandhartlaw.com
jonny@hartandhartlaw.com
*Attorneys for Plaintiff*

---

### IN THE UNITED STATES DISTRICT COURT
### STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GAYLENE DAVIS, individually, on behalf of the heirs and as Personal Representative of the Estate of JASON TODD MACE, <br><br> Plaintiff, <br><br> vs. <br><br> PROVO CITY; MEDINA DORE; JASON MAHONEY; ZACHARY MIGUEL; CARTER GROW; CHET WHATCOTT; R. DALE CHRISTENSEN, M.D.; INTERMOUNTAIN HEALTH CARE, INC., dba UTAH VALLEY HOSPITAL; and DOES 1-10. <br><br> Defendants. | **FIRST AMENDED COMPLAINT** <br><br> **(JURY DEMANDED)** <br><br> Case No.          2:22-cv-00629 <br><br> Judge:          David Barlow <br><br> Magistrate Judge:    Daphne A. Oberg |

COMES NOW Plaintiff Gaylene Davis, for the Estate of Jason Todd Mace and on behalf

of the heirs of Jason Todd Mace, by and through undersigned counsel, and hereby amends her

complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure and alleges against

Defendants as follows:

–1–

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's cause of action arising under the Constitution of the Unites States and 42 U.S.C. § 1983 and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction of Plaintiff's causes of action arising under the Utah state law pursuant to 28 U.S.C. § 1367.

2. Venue lies in the United States District Court for the District of Utah because the events and omissions giving rise to Plaintiff's claims occurred in Utah County, Utah. 28 U.S.C. § 1391(b)(2).

3. Defendants are subject to personal jurisdiction within this district.

4. Plaintiff has completed the notice-of-claim and undertaking requirements of the Utah Governmental Immunity Act, Utah Code Ann. § 63G-7-101 *et seq.*

5. Plaintiff has completed the pre-litigation requirements of the Utah Health Care Malpractice Act, Utah Code Ann. § 78B-3-401 *et seq.*

## PARTIES

6. Prior to his death, Jason Todd Mace (hereinafter, "Decedent"), was and at all times pertinent had been a citizen of the United States and a resident of the State of Utah.

7. Plaintiff Gaylene Davis, the mother of Decedent, has been duly appointed personal representative of the Estate of Jason Todd Mace by the Fourth Judicial District Court in and for Utah County, State of Utah, case number 213400591.

8. Plaintiff brings this action on behalf of the heirs of Jason Todd Mace and on behalf of the Estate of Jason Todd Mace.

9.  Defendant Provo City (hereinafter, "Provo"), is a political subdivision of the State of Utah. As part of its corporate powers, and at all times relevant, Provo maintained and controlled Provo City Police Department. Provo is a 'person' subject to 42 U.S.C. § 1983 liability.

10. Defendant Medina Dore (hereinafter, "Dore"), believed to be a resident of Utah County, Utah, was employed as a Police Officer by Provo. Defendant Dore is a person subject to 42 U.S.C. § 1983 liability.

11. Defendant Jason Mahoney (hereinafter, "Mahoney"), believed to be a resident of Utah County, Utah, was employed as a Police Officer by Provo. Defendant Mahoney is a person subject to 42 U.S.C. § 1983 liability.

12. Defendant Zachary Miguel (hereinafter, "Miguel"), believed to be a resident of Utah County, Utah, was employed as a Police Officer by Provo. Defendant Miguel is a person subject to 42 U.S.C. § 1983 liability.

13. Defendant Carter Grow (hereinafter, "Grow"), believed to be a resident of Utah County, Utah, was employed as a Police Officer, in a supervisory role, by Provo. Defendant Grow is a person subject to 42 U.S.C. § 1983 liability.

14. Defendant Chet Whatcott (hereinafter, "Whatcott"), believed to be a resident of Utah County, Utah, was employed as a Police Officer, in a supervisory role, by Provo. Defendant Whatcott is a person subject to 42 U.S.C. § 1983 liability.

15. Defendant R. Dale Christensen, M.D., (hereinafter, "Dr. Christensen"), an emergency physician licensed to practice medicine in Utah, and upon information and belief is a resident of Utah County, Utah.

16. Defendant Intermountain Health Care, Inc., DBA Utah Valley Hospital, (hereinafter, "UVH"), is a Utah corporation.

17. Does 1-10 are presently unidentified individuals and/or entities, upon information and belief thought to be residents of the State of Utah, that through their acts or omissions were reckless and/or negligent in causing or contributing to the incident described hereafter. Plaintiff reserves the right to name these individuals or entities as Defendants in this action when their identities are discovered.

## **GENERAL ALLEGATIONS**

18. On September 28, 2020, at about 1:00 a.m., Officers Mahoney, Miguel, Dore, Whatcott, and Grow (collectively, the "Officers") responded to a dispatch call at Decedent's home.

19. Officer Whatcott and Grow were supervising officers with Provo City Police.

20. Officer Dore was the case officer/manager for the charges and arrest of Decedent.

21. Upon arrival by Officer Miguel, Plaintiff informed Officer Miguel that Decedent was drunk and had just taken a "handful of pills."

22. Plaintiff gave Officer Miguel permission to enter the home to help with Decedent.

23. Decedent was clearly agitated, emotional, and belligerent when Officer Miguel and Officer Mahoney made contact with him.

24. Upon arrival of Officers Whatcott, Grow, and Dore, Decedent's family immediately informed the three officers that Decedent had said, "no one cared" before taking a "handful of pills."

25. Immediately upon hearing information that Decedent had taken a handful of pills, Officer Whatcott approached Officer Mahoney in the doorway of the home and told him, "they said he took a bunch of pills" – to which, Officer Mahoney said, "Okay."

26. Decedent's family informed Officer's Grow and Dore that Decedent prematurely exited a rehabilitation program that day.

27. Decedent's family informed Officer Grow that the biggest problem was that Decedent starting drinking then took the pills.

28. Officer Grow said "Gotcha" in response to Decedent's family stating that Decedent said he "took every last one of his pills."

29. Officer Grow asked Decedent's family, "what kind of pills would they be, do you know, if they're his pill?"

30. Decedent's family then informed Officers Grow and Whatcott that the pills Decedent took were Trazadone, anti-depressant, anxiety, and quetiapine medications.

31. Officers Grow and Whatcott chose not to inform any other officer that Decedent likely took, as a handful, every last one of his Trazadone, anti-depressant, anxiety, and/or quetiapine pills.

32. Decedent was then placed in custody at about 1:10 a.m. for his alleged involvement in a domestic physical altercation with his brother.

33. During the arrest, Officer Dore noticed that Decedent's back was soiled in sweat.

34. During the arrest, and the subsequent transfer of Decedent to a patrol vehicle, Decedent remained agitated, emotional, and belligerent.

35. Officers Grow and Miguel expressly denied a request by the Provo City Fire Department, who was on the scene at Decedent's home, for medical assistance of Decedent.

36. Officers Dore, Mahoney, and Whatcott were also aware that Provo City Fire Department was there for medical assistance, and none presented Decedent for medical treatment.

37. After being placed in an officer's vehicle, Officer Mahoney noticed that Decedent vomited, and Officer Mahoney then informed Officers Whatcott, Grow, and Miguel.

38. Officer Mahoney then expressed to Officers Whatcott, Grow, and Miguel concern over whether Decedent was overdosing in the back of the police vehicle.

39. Officer Grow instructed that Decedent should be taken to the hospital for a medical clearance "due to the fact that we were told that he took those pills and that he had gotten in a fight with his brother."

40. Officers Whatcott, Grow, and Dore then talked with Decedent's family after Decedent was arrested.

41. In talking to Decedents family, Officer Dore said it was obvious he was on something.

42. Officer Whatcott said, "he's on his way to the hospital," in response to Decedent's family asking what "you guys" were going to do about all the pills that Decedent took.

43. Plaintiff expressed concern about whether Decedent was going to receive timely medical care to Officers Whatcott, Grow, and Dore. Officer Whatcott responded by saying, "that's why we had medics and stuff like it … right here, because we could tell something was way up."

44. Decedent's family then informed Officers Whatcott, Grow, and Dore that a known drug dealer had visited with Decedent and had possibly given Decedent drugs.

45. Officer Whatcott, Grow, and Dore did not ask Decedent's family what drugs Decedent may have been given by the drug dealer.

46. There was no reason for the Officers to disbelieve Decedent's family's reports that Decedent took a handful of pills, every last one of his pills, likely including Trazadone, anti-depressant, anxiety, and quetiapine medications, and that Decedent had possibly been given drugs by a known drug dealer.

47. None of the Officers conducted a physical search of Decedent's room for evidence of pills, pill bottles, drugs, or drug paraphernalia.

48. Officers Whatcott and Grow "went about their business" after the incident and did not go to UVH, or otherwise ensure their subordinates obtain medical treatment for Decedent's pill/drug consumption.

49. Decedent arrived at UVH at around 1:25 a.m. for a medical clearance to go to jail.

50. Upon arrival at UVH Decedent remained agitated, emotional, and belligerent.

51. Officers Mahoney, Miguel, and Dore were with Decedent at UVH while Decedent was evaluated by UVH staff.

52. UVH staff were informed by Officers Dore, Mahoney, and Miguel that Decedent had minor injuries on his hand and foot due to a fight with his brother and/or his arrest.

53. Officers Mahoney, Miguel, and Dore only requested the medical clearance from IHC for the minor injuries on Decedent's hand and foot.

54. No Provo officer informed medical staff at UVH that Decedent had consumed a handful, or a bunch of pills.

55. Officer Dore did not inform medical staff at UVH that Decedent had possibly been given drugs by a known drug dealer.

56. Officers Mahoney, Miguel, and Dore misdirected UVH staff's medical evaluation of Decedent by deliberately withholding vital medical information about Decedent's pill/drug consumption.

57. Officers Grow and Whatcott did not ensure that their subordinates inform medical staff at UVH of Decedent's pill consumption.

58. Decedent exhibited many signs of drug impairment while at UVH – both before and after he had been medically cleared for jail. Specifically, Decedent was extremely agitated, irrational, and belligerent. He also had vomited, had slurred speech, was extremely drowsy, and was mobilized only by wheelchair.

59. Decedent had a well-documented history of substance abuse, mental health, and suicide attempts at UVH; including less than three months prior, treatment at UVH for an intentional overdose.

60. UVH staff did not review, ignored, or disregarded Decedent's medical history/records showing he was at risk of self-harm by intentional overdose.

61. UVH nurses noted that Decedent was drunk and vomiting, and also that his appearance showed evidence of chemical influence.

62. UVH staff did not inform Dr. Christensen that Decedent was drunk and vomiting, showing evidence of chemical influence.

63. Dr. Christensen stated that he reviewed the nursing notes prior to clearing Decedent for jail.

64. Dr. Christensen medically cleared Decedent for jail without any treatment for Decedent's drug impairments.

65. Despite the information in the nursing notes, on the form clearing Decedent for Jail, Dr. Christensen answered "No" on the question, "[i]s the patient exhibiting any signs of drug/alcohol impairment?"

66. Dr. Christensen then wrote "N/A" on the follow-up portion requesting, "[i]f yes, lab results."

67. Dr. Christensen did not review, ignored, or disregarded Decedent's medical history/records showing he was at risk of self-harm by intentional overdose.

68. UVH staff did not inform Dr. Christensen that Decedent had vomited at UVH after being medically cleared for jail.

69. UVH staff did not inform Dr. Christensen that Decedent was drowsy to the point of falling asleep while sitting on the doctor's table after being medically cleared for jail.

70. Officer Miguel, and possibly Officers Mahoney and Dore, were in the room while Dr. Christensen evaluated Decedent. None of the three informed Dr. Christensen about Decedent's pill/drug consumption.

71. Officers Dore, Mahoney, and Miguel observed Decedent vomit, and that he was falling asleep while sitting on the doctor's table.

72. Officer Mahoney whispered to Officer Dore after Decedent vomited, "this is the fourth time." Officer Dore made no verbal response.

73. Officer Dore was handed the medical clearance form and reviewed it. The medical clearance form clearly showed that Decedent did not receive any medical treatment for intoxication.

74. Officers Dore, Mahoney, and Miguel knew or should have known that Decedent did not receive any medical attention for intoxication or pill consumption while at UVH.

75. Decedent was wheelchaired out of UVH at around 2:10 a.m. and transported to Utah County Jail (hereinafter, the "Jail") by Officer Mahoney.

76. Decedent vomited again while being transported to the Jail, and Officer Mahoney informed Officer Dore of that upon arriving at the Jail by saying, "he threw up three more times back there. He is covered…"

77. Once at the Jail, the Jail's nurse was concerned about Decedents impairment and required that Officer Mahoney perform a breathalyzer test before the Jail would consider admitting Decedent. The test revealed a .06 blood alcohol level.

78. Officer Mahoney dishonestly stated to the Jail's nurse that Decedent was walking under his own power at the hospital.

79. Decedent began to have seizures while at the Jail's sallyport.

80. Jail medical staff assisted Decedent and an ambulance was called to transport Decedent to a hospital.

81. While waiting for the ambulance and while Decedent was repeatedly having seizures and struggling for oxygen, the Jail nurse asked Officers Dore and Mahoney if Decedent's family said anything about him doing drugs. Both officers denied being told about Decedent taking drugs.

82. Officer Mahoney told the Jail's nurse that "we didn't hear anything about medicals, it was just a fight," while Officer Dore stood next to Officer Mahoney and remained silent.

83. Officer Dore and Mahoney watched, and were aware of, the Jail's medical personnel's attempts to diagnose the cause of Decedent's rapidly deteriorating health.

84. Officers Dore and Mahoney intentionally withheld known medical information about Decedent's rapidly deteriorating health, pill/drug overdose, from medical personnel at the Jail.

85. An ambulance transported Decedent back to UVH, where he arrived in cardiac arrest.

86. At 3:53 a.m. Decedent was pronounced dead.

87. The cause of Decedent's death was drug intoxication. The drugs causing Decedent's death were ethanol, sertraline, and hydroxyzine.

88. Nearly the entire time from when the Officers made contact with Decedent until his death was captured by body camera footage.

89. Officer Dore dishonestly said after Decedents death that she was not told by Decedent's family that Decedent had taken pills.

90. Officer Dore said after Decedents death, "pretty sure the family is doing wonderful now that they have that person out of the house."

91. Officer Miguel said after the incident that he remembered being told by Decedent's mother that Decedent was intoxicated and possibly took some pills.

92. Officer Grow said after Decedents death that "our protocol was to get that clearance … just hearing the traffic over the air, I'm like, okay they're done with the clearance… going down to the jail, all is groovy now."

93. Provo Police Department does not have a publicly available version of its policy manual.

94. Provo Police Department only scrutinized or reviewed the acts of the Officers under its policies regarding Use of Force, Handcuffing and Restrains, Control Devices and Techniques, Portable Audio/Video Recorders, and Naloxone Administration.

95. Provo Police Department never scrutinized or reviewed the actions of the Officers under any policy related to Medical Aid and Response or Crisis Intervention Incidents.

96. At least two of the Officers, Miguel and Dore, were certified and trained to be part of Provo's Crisis Intervention Team, which is focused on providing treatment and recovery for those suffering from mental illness. Officer Dore received such certification two weeks prior to Decedent's death.

## FIRST CAUSE OF ACTION
**42 U.S.C. § 1983 (Failure to Provide Proper Medical Care) Against Officers Dore, Mahoney, Miguel, Whatcott, and Grow**

97. Plaintiff adopts and re-alleges all preceding allegations.

98. Under federal law, made applicable to state and local governments and to those officers and officials acting under color of law and authority, Decedent had the Constitutional right to be free from cruel and unusual punishment.

99. Decedent's right to be free from cruel and unusual punishment is a clearly established fundamental right protected by the Eight and Fourteenth Amendments to the United States Constitution, as well as by Section 1983 of the Civil Rights Act, Title 42 of the United States Code.

100. Decedent's right to be free from cruel and unusual punishment was violated by Officers Dore, Mahoney, Miguel, Whatcott, and Grow.

101. The law is clearly established that state and local officials violate an individual's right to be free from cruel and unusual punishment if they act with deliberate indifference to a pretrial detainee's known or obvious serious medical needs, and/or the known or obvious risk of suicide of a specific pretrial detainee. Deliberate indifference may be shown when state or local officials intentionally ignore a known or obvious medical need, or if they deny, delay, or interfere with medical care.

102. Officers Dore, Mahoney, Miguel, Whatcott, and Grow knew, or it was obvious that Decedent had a serious medical condition and was a substantial risk of suicide because of his observable symptoms of intoxication combined with explicit numerous reports that Decedent had taken "a handful of pills," or a "bunch of pills."

103. Officers Grow and Dore knew, or it was obvious that Decedent had a serious medical condition and was a substantial risk of suicide because of the additional information they had obtained that Decedent had prematurely exited a rehabilitation program that day.

104. Officers Grow and Whatcott knew, or it was obvious that Decedent had a serious medical condition and was a substantial risk of suicide because of the additional

information they had obtained that Decedent took every last one of his Trazadone, anti-depressant, anxiety, and/or quetiapine pills.

105. Officers Dore, Whatcott, and Grow knew, or it was obvious that Decedent had a serious medical condition and was a substantial risk of suicide because of the additional information they had obtained that Decedent may have been given drugs by a known drug dealer.

106. Officers Dore, Mahoney, Miguel, Whatcott, and Grow knew, or should have inferred, that Decedent faced a substantial risk of serious harm or death if the reports of Decedent's pill/drug consumption were disregarded.

107. During the material events in this case, Decedent was under the dominion, custody, and control of the Officers who, acting under color of law, were deliberately indifferent to Decedents serious medical needs.

108. Officers Dore, Miguel, Whatcott, and Grow exhibited deliberate indifference to Decedent's serious medical needs by willfully ignoring Plaintiff's dire warning that Decedent had intentionally ingested a dangerous amount of prescription medication.

109. Officer Mahoney exhibited deliberate indifference to Decedent's serious medical needs by willfully ignoring Officer Whatcott's report that Decedent had taken a bunch of pills.

110. Officers Miguel and Grow also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by willfully denying requests from the Provo City Fire Department medical staff for medical assistance to Decedent after being informed that Decedent had ingested a dangerous amount of prescription medication.

111. Officers Dore, Mahoney, and Whatcott exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by willfully choosing not to present Decedent to Provo City Fire Department medical staff for medical assistance and transportation after being informed that Decedent had ingested a dangerous amount of prescription medication.

112. Officers Dore, Mahoney, and Miguel also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by willfully withholding information about Decedent's drug overdose to medical staff at UVH – thereby delaying and interfering with medical treatment for Decedent's serious medical needs.

113. Officers Dore, Mahoney, and Miguel also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by removing Decedent from UVH knowing that Decedent had not received any treatment for his drug overdose while there – thereby delaying medical treatment for Decedent's serious medical needs.

114. Officer Mahoney also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by choosing to misinform staff at the Jail that Decedent was walking under his own power at UVH when he was not – thereby delaying and interfering with medical treatment for Decedent's serious medical needs.

115. Officers Dore and Mahoney also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by willfully withholding information about Decedent's drug overdose to medical staff at the Jail, even while Decedent was seizing on the ground struggling for breath.

116. Officers Whatcott and Grow also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by willfully withholding the important medical information that Decedent had taken every last one of his Trazadone, anti-depressant, anxiety, and/or quetiapine pills.

117. Officers Dore, Mahoney, Miguel, Whatcott, and Grow also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by willfully ignoring the obvious signs that Decedent was severely and dangerously impaired by drugs and/or alcohol.

118. Officers Dore, Mahoney, Miguel, Whatcott, and Grow also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by willfully ignoring the severe and obvious deterioration of Decedent's health while in their custody.

119. Officers Dore, Mahoney, Miguel, Whatcott, and Grow violated Decedent's constitutional rights by willful misconduct.

120. Officers Dore, Mahoney, Miguel, Whatcott, and Grow knew or should have known that Decedent had ingested a dangerous amount of prescription pills and that he needed to receive medical treatment for that condition, but not one of the Officers took any affirmative steps to ensure medical treatment for his serious medical condition.

121. Officers Dore, Mahoney, Miguel, Whatcott, and Grow knew of the excessive risk Decedent's serious medical condition posed to his health and safety, yet they disregarded this risk.

122. At all times material herein, Decedent was suffering from suicidal ideation and drug impairments, and he was incapable of medically managing his condition.

123. At all times material herein, Decedent was dependent upon Officers Dore, Mahoney, Miguel, Whatcott, and/or Grow to manage his condition.

124. As gatekeepers of vital medical information, Officers Dore, Mahoney, Miguel, Whatcott, and Grow took upon themselves the responsibility to make life or death decisions for Decedent by willfully withholding information about Decedent's medical condition and risk of suicide from medical staff.

125. The conduct of Officers Dore, Mahoney, Miguel, Whatcott, and Grow as alleged herein deprived Decedent of his Constitutional civil rights.

126. As a result of being deprived of his Constitutional civil rights, Decedent was made to suffer cruel and unusual punishment at the hand of Officers Dore, Mahoney, Miguel, Whatcott, and Grow .

127. As a direct and proximate result of Officers Dore, Mahoney, Miguel, Whatcott, and Grow's deliberate indifference, Decedent died while in their custody.

128. As a direct and proximate result of Officers Dore, Mahoney, Miguel, Whatcott, and Grow's deliberate indifference, Decedent was caused to endure prolonged pain and suffering leading up to the time of his death, even though his condition could have been treated and stabilized. Accordingly, Plaintiff seeks compensation in an amount to be determined at trial for the pain and suffering Decedent endured prior to his death.

129. As a direct and proximate result of Officers Dore, Mahoney, Miguel, Whatcott, and Grow's deliberate indifference, Decedent's estate incurred special damages (economic damages) in the amount of $13,622.55 for funeral and medical costs.

130. As a direct and proximate result of Officers Dore, Mahoney, Miguel, Whatcott, and Grow's deliberate indifference, Decedent's estate incurred special damages (economic damages) for Decedent's loss of future earnings in an amount to be determined at trial.

131. Further, due to the willful, malicious, and/or callous nature of Officers Dore, Mahoney, Miguel, Whatcott, and Grow's conduct, manifesting a knowing and reckless disregard for Decedent's rights, Plaintiff seeks punitive damages against the Officers.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 (Failure to Supervise) Against Provo Supervising Officials, Officers Whatcott and Grow

132. Plaintiff adopts and re-alleges all preceding allegations.

133. During the material events in this case, Officer Whatcott and Officer Grow were supervising officers. Officer Whatcott was a Lieutenant and Officer Grow was a Sergeant with the Provo City Police Department. Officer Grow was designated the shift supervisor during the material events in this case.

134. Officers Whatcott and Grow were in charge of the other officers, including Officers Dore, Mahoney, and Miguel, during the material events in this case.

135. Officers Whatcott and Grow were personally involved in the material events in this case.

136. Specifically, Officers Whatcott and Grow were physically at Decedent's home during his arrest and had actively gathered information about Decedent from Decedent's

family, including information about what specific medications Decedent had ingested, i.e., Trazadone, anti-depressant, anxiety, and quetiapine pills.

137. Officers Whatcott and Grow knew, or it was obvious that Decedent had a serious medical condition and was a substantial risk of suicide because of his observed symptoms of intoxication combined with explicit reports that Decedent had taken "a handful of pills," that Decedent took every last one of his Trazadone, anti-depressant, anxiety, and quetiapine pills, and that Decedent may have been given drugs by a known drug dealer.

138. Officer Grow knew Decedent's pill consumption was a serious medical need since he instructed that a medical clearance be obtained "due to the fact that we were told that he took those pills."

139. Officer Whatcott knew Decedent's pill consumption was a serious medical need since he said "he's on his way to the hospital" in response to Decedent's mother specifically asking what "you guys" were going to do about all the pills that Decedent took.

140. Officers Whatcott and Grow exhibited deliberate indifference to Decedent's serious medical needs by willfully withholding important information they had personally gathered, including information about what medications Decedent had ingested, from subordinate officers responsible for communicating with medical staff regarding Decedent – thereby delaying medical treatment for Decedent's serious medical needs.

141. Officers Whatcott and Grow also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by willfully choosing not to have Provo City

Fire Department medical personnel, who were on scene, treat and transport Decedent – thereby denying and delaying treatment for Decedent's serious medical needs.

142. Officers Whatcott and Grow also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by willfully choosing to go about their business and not to control and/or direct their subordinates in obtaining medical care for Decedent's drug overdose – thereby ignoring the serious medical needs and risk of suicide of Decedent.

143. Officers Whatcott and Grow also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by maintaining, implementing, or promulgated an unconstitutional custom or informal policy of ignoring overdose reports and/or failing to treat reports of overdose as a serious medical need.

144. Officers Whatcott and Grow also exhibited deliberate indifference to Decedent's serious medical needs and risk of suicide by maintaining, implementing, or promulgated an unconstitutional formal regulation/policy or informal custom of improperly obtaining medical clearances where the clearance itself was the objective rather than ensuring adequate medical care for the known medical needs of pretrial detainees.

145. Officers Whatcott and Grow violated Decedent's constitutional rights by willful misconduct.

146. Officers Whatcott and Grow knew, or should have known, that their actions and/or inactions created a situation with a substantial risk of constitutional harm to Decedent.

147. As a result of the conduct of Officers Whatcott and Grow, Decedent did not receive treatment for his serious medical needs and was made to suffer cruel and unusual punishment at the hand of Provo Officials.

148. As a direct and proximate result of Officers Whatcott and Grow's deliberate indifference, Decedent died while in custody.

149. As a direct and proximate result of Officers Whatcott and Grow's deliberate indifference, Decedent was caused to endure prolonged pain and suffering leading up to the time of his death, even though his condition could have been treated and stabilized. Accordingly, Plaintiff seeks compensation in an amount to be determined at trial for the pain and suffering Decedent endured prior to his death.

150. As a direct and proximate result of Officers Whatcott and Grow's deliberate indifference, Decedent's estate incurred special damages (economic damages) in the amount of $13,622.55 for funeral and medical costs.

151. As a direct and proximate result of Officers Whatcott and Grow's deliberate indifference, Decedent's estate incurred special damages (economic damages) for Decedent's loss of future earnings in an amount to be determined at trial.

152. Further, due to the willful, malicious, and/or callous nature of the Officers' conduct, manifesting a knowing and reckless disregard for Decedent's rights, Plaintiff seeks punitive damages against the Officers.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 (Municipal Liability) Against Provo, Provo Policymakers

153. Plaintiff adopts and re-alleges all preceding allegations.

154. Separate from, or in addition to State training requirements, Provo maintained inadequate training and supervision of members in its Crisis Intervention Team.

155. Provo's inadequate training and supervision of members in its Crisis Intervention Team resulted in deficient treatment of individuals suffering from mental illness, including those with a substantial risk of suicide.

156. Provo's inadequate training and supervision of members in its Crisis Intervention Team caused injury to Decedent as at least two Officers, Miguel and Dore, were part of Provo's Crisis Intervention Team, and both utterly failed to ensure treatment for Decedent's obvious mental illness and reports of his substantial risk of suicide.

157. Provo had actual and constructive notice that its failure to adequately train and supervise its Crisis Intervention Team was substantially certain to result in constitutional violations of detainee's suffering from mental illness, including those with a substantial risk of suicide.

158. Provo's actions (or inaction) regarding the inadequate training and supervision of members in its Crisis Intervention Team stemmed from deliberate indifference.

159. Provo maintained an unconstitutional informal custom of ignoring reports of overdoses and/or failing to treat reports of overdose as a serious medical need, which resulted in a deficient medical response protocol.

160. Provo's custom regarding ignoring overdose reports and/or failing to treat reports of overdose as a serious medical need caused Decedent's death.

161. Provo had actual and constructive notice that its informal custom of ignoring overdose reports and/or failing to treat reports of overdose as a serious medical need was

substantially certain to result in constitutional violations of detainee's who have been reported to be suffering an overdose.

162. Provo's custom regarding ignoring overdose reports and/or failing to treat reports of overdose as a serious medical need is supported by a previous incident (i.e., the death of Helen Faucheaux), or incidents, where officers were told that an individual was suspected of a drug overdose and later died due to the failure of Provo officials to ensure medical treatment.

163. Provo's actions (or inactions) regarding its custom of ignoring overdose reports and/or failing to treat reports of overdose as a serious medical need stemmed from deliberate indifference.

164. Provo had a formal regulation/policy, informal custom, or inadequate training/supervision regarding medical clearances where the clearance itself was the objective rather than ensuring adequate medical care for known medical needs of pretrial detainees.

165. Provo's formal regulation/policy, informal custom, or inadequate training/supervision regarding improperly obtaining medical clearances resulted in deficient medical treatment of pretrial detainees with serious medical needs.

166. Provo's formal regulation/policy, informal custom, or inadequate training/supervision regarding of improperly obtaining medical clearances caused Decedent's death.

167. Provo had actual and constructive notice that its formal regulation/policy, informal custom, or inadequate training/supervision regarding improperly obtaining medical

clearances was substantially certain to result in constitutional violations of detainee's with known serious medical needs.

168. Provo's actions (or inactions) regarding its formal regulation/policy, informal custom, or inadequate training/supervision regarding improperly obtaining medical clearances stemmed from deliberate indifference.

169. As a result of the conduct of one of the Officers, or the combined acts or omissions of all the Officers, acting under the inadequate training/supervision, informal policy, and/or formal regulation/policy listed herein, Decedent did not receive treatment for his serious medical needs and was made to suffer cruel and unusual punishment at the hand of Provo officials.

170. As a direct and proximate result, Decedent died while in custody of Provo Officials.

171. As a direct and proximate result, Decedent was caused to endure prolonged pain and suffering leading up to the time of his death, even though his condition could have been treated and stabilized. Accordingly, Plaintiff seeks compensation in an amount to be determined at trial for the pain and suffering Decedent endured prior to his death.

172. As a direct and proximate result, Decedent's estate incurred special damages (economic damages) in the amount of $13,622.55 for funeral and medical costs.

173. As a direct and proximate result, Decedent's estate incurred special damages (economic damages) for Decedent's loss of future earnings in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Deprivation of Rights under Article I, Section 9 of the Utah Constitution, Unnecessary Rigor in Confinement Against Provo and its Officials

174. Plaintiff adopts and re-alleges all preceding allegations.

175. Under Article I, Section 9 of the Utah Constitution, Decedent had a right to be free from being subjected to or treated with unnecessary rigor while under arrest.

176. Decedent's right to be free from unnecessary rigor while under arrest was violated by the Officers and/or Provo officials.

177. During the material events in this case, Decedent was under arrest by Provo officials.

178. Officers Dore, Mahoney, Miguel, Whatcott, and Grow unreasonably subjected Decedent to harsh, strict, and/or severe treatment by unnecessarily exposing Decedent to an increased risk of serious harm.

179. Officers Dore, Mahoney, Miguel, Whatcott, and Grow knew, or it was obvious that Decedent had a serious medical condition and was a substantial risk of suicide.

180. Decedent was unnecessarily exposed to an increased risk of serious harm when Officers Miguel and Grow refused requests from the Provo City Fire Department medical staff shortly after the arrest for medical assistance to Decedent after being informed that Decedent had ingested a dangerous amount of prescription medication.

181. Decedent was unnecessarily exposed to an increased risk of serious harm when Officers Dore, Mahoney, and Whatcott chose not to present Decedent to Provo City Fire Department medical staff for medical assistance and transportation after receiving credible reports that Decedent was overdosing.

182. Decedent was also unnecessarily exposed to an increased risk of serious harm when Officers Dore, Mahoney, and Miguel withheld vital information about Decedent's serious medical condition from medical staff at UVH.

183. Decedent was also unnecessarily exposed to an increased risk of serious harm when Officers Dore, Mahoney, and Miguel removed Decedent from UVH knowing that Decedent had not received any treatment for his drug overdose while there.

184. Decedent was also unnecessarily exposed to an increased risk of serious harm when Officer Mahoney chose to misinform staff at the Jail that Decedent was walking under his own power at UVH when he was not.

185. Decedent was also unnecessarily exposed to an increased risk of serious harm when Officers Dore and Mahoney withheld vital information about Decedent's serious medical condition from medical staff at the Jail.

186. Decedent was also unnecessarily exposed to an increased risk of serious harm when Officers Whatcott and Grow withheld important medical information that Decedent had taken every last one of his Trazadone, anti-depressant, anxiety, and/or quetiapine pills.

187. Decedent was also unnecessarily exposed to an increased risk of serious harm when Officers Dore, Mahoney, Miguel, Whatcott, and Grow willfully ignored the obvious signs that Decedent was severely and dangerously impaired by drugs and/or alcohol.

188. Decedent was also unnecessarily exposed to an increased risk of serious harm when Officers Dore, Mahoney, Miguel, Whatcott, and Grow willfully ignored the severe and obvious deterioration of Decedent's health while in their custody.

189. Officers Dore, Mahoney, Miguel, Whatcott, and Grow were explicitly notified that Decedent ingested a dangerous amount of prescription medication.

190. Officers Dore, Mahoney, Miguel, Whatcott, and Grow were also on notice of Decedent's serious medical condition due to the signs of drug impairment that he

exhibited while under arrest, i.e., vomiting, nausea, profuse sweating, irrational, emotional, speech slurring, and extreme drowsiness.

191. Officers Dore, Mahoney, Miguel, Whatcott, and Grow knew, or should have known, that a person experiencing a drug overdose has a serious medical condition that is time-sensitive, and that delaying treatment would likely increase the severity of injury and suffering to that person.

192. Officers Dore, Mahoney, Miguel, Whatcott, and Grow did not inform any medical staff about Decedent ingesting a dangerous amount of prescription medication or about the impairment signs that Decedent exhibited while he was under arrest.

193. Officers Dore, Mahoney, Miguel, Whatcott, and Grow flagrantly failed to ensure medical treatment for Decedent's known serious medical condition while he was under arrest.

194. Specifically, failing to ensure treatment for an arrestee known to be experiencing a drug overdose presents an obvious and known serious risk of harm to the arrestee.

195. There is no reasonable justification for Officers Dore, Mahoney, Miguel, Whatcott, and Grow's failure to ensure medical treatment for Decedent's known serious medical condition.

196. Provo failed to provide adequate policies, procedures, protocols, and training to their employees or contractors to reasonably provide for the safety and health of arrestees, including Decedent, who require medical treatment for known serious medical conditions, by:

    a. Failing to adequately train and supervise its Crisis Intervention Team.

–27–

b. Maintaining an informal custom of ignoring reports of overdoses and/or failing to treat reports of overdose as a serious medical need.

c. Maintaining a formal regulation/policy, informal custom, or inadequate training/supervision regarding medical clearances where the clearance itself was the objective rather than ensuring adequate medical care.

197. Provo's failure to provide adequate policies, procedures, protocols, and training evince a deliberate indifference to the Constitutional rights of its arrestees. And, that such a failure is likely to cause serious injury or death to those under arrest by Provo officials.

198. Provo officials and Officers Dore, Mahoney, Miguel, Whatcott, and Grow's failure to ensure medical care for Decedent's serious medical condition, which was known by the Officers, subjected Decedent to unnecessary rigor in violation of Utah's Constitution.

199. As a direct and proximate result of Provo officials and the officers' failures, Decedent died while in their custody.

200. As a direct and proximate result of Provo officials and the officers' failure, Decedent was caused to endure prolonged pain and suffering leading up to the time of his death, even though his condition could have been treated and stabilized. Accordingly, Decedent's estate seeks compensation in an amount to be determined at trial for the pain and suffering Decedent endured prior to his death.

201. As a direct and proximate result of Provo officials and the officers' failure, Decedent's estate incurred special damages (economic damages) in the amount of $13,622.55 for funeral and medical costs.

202. As a direct and proximate result of Provo officials and the officers' failure, Decedent's estate incurred special damages (economic damages) for Decedent's loss of future earnings in an amount to be determined at trial.

203. Further, due to the willful, malicious, and/or callous nature of Provo officials' conduct, manifesting a knowing and reckless disregard for Decedent's rights, Decedent's estate seeks punitive damages against Provo Employees.

## FIFTH CAUSE OF ACTION
### Negligence Against Dr. Christensen

204. Plaintiff adopts and re-alleges all preceding allegations.

205. A provider-patient relationship existed between Dr. Christensen and Decedent.

206. Dr. Christensen undertook and did render health care to Decedent.

207. Dr. Christensen owed a duty of care to Decedent consistent with the duty of care owed by similar healthcare providers.

208. Dr. Christensen breached the applicable standard of care that resulted in harm to Decedent.

209. Specifically, considering Decedent's documented history of substance abuse, mental health, and suicide attempts, as well as Decedent's signs of drug/alcohol impairment during the material events in this case, and nursing staff opinions that Decedent was drunk or under chemical influence, Dr. Christensen failed to properly diagnose and treat Decedent for drug/alcohol intoxication.

210. Dr. Christensen's failure to properly diagnose and treat Decedent for drug/alcohol intoxication caused Decedent to be sent to jail without medical treatment and to endure prolonged pain and suffering leading to his death.

211. As a direct and proximate result of Dr. Christensen's failures, Plaintiff seeks compensation in an amount to be determined at trial for pain and suffering Decedent endured prior to his death.

212. As a direct and proximate result of Dr. Christensen's failures, Decedent's estate incurred special damages (economic damages) in the amount of $13,622.55 for funeral and medical costs.

213. As a direct and proximate result of Dr. Christensen's failures, Decedent's estate incurred special damages (economic damages) for Decedent's loss of future earnings in an amount to be determined at trial

## SIXTH CAUSE OF ACTION
**Negligence Against UVH Nursing Staff**

214. Plaintiff adopts and re-alleges all preceding allegations.

215. A provider-patient relationship existed between UVH nursing staff and Decedent.

216. UVH nursing staff undertook and did render health care to Decedent.

217. UVH nursing staff owed Decedent a duty of care consistent with the duty of care owed by similar healthcare providers.

218. UVH nursing staff breached the applicable standard of care that resulted in harm to Decedent.

219. Specifically, considering Decedent's signs of drug/alcohol impairment while being treated by UVH nursing staff, UVH nursing staff failed to report Decedent's impairment signs and/or failed to report changes in Decedent's status to Dr. Christensen.

220. Also considering Decedent recent documented history of substance abuse, mental health, and suicide attempts, UVH staff failed to take proper suicide prevention measures and/or failed to properly evaluate Decedent's risk of suicide, especially considering Decedent's signs of drug/alcohol impairment.

221. UVH nursing staff's failure to report Decedent's impairment signs and/or failure to report changes in Decedent's status to Dr. Christensen, and their failure to take proper suicide prevention measures and/or failure to properly evaluate Decedent's risk of suicide caused Decedent to be sent to jail without proper medical treatment and caused Decedent to endure prolonged pain and suffering leading to his death.

222. As a direct and proximate result of UVH nursing staff's failures, Plaintiff seeks compensation in an amount to be determined at trial for pain and suffering Decedent endured prior to his death.

223. As a direct and proximate result of UVH nursing staff's failures, Decedent's estate incurred special damages (economic damages) in the amount of $13,622.55 for funeral and medical costs.

224. As a direct and proximate result of UVH nursing staff's failures, Decedent's estate incurred special damages (economic damages) for Decedent's loss of future earnings in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Vicarious Liability/Respondeat Superior Against UVH

225. Plaintiff adopts and re-alleges all preceding allegations.

226. The negligent acts of the employees and agents of UVH (including Dr. Christensen, UVH nursing staff, and others) caused Decedent's death.

227. These acts were the kind of act that Dr. Christensen, UVH nursing staff, and other staff typically perform as employees and agents of UVH.

228. These acts occurred within the ordinary hours and spatial boundaries of their employment and agency.

229. These acts were motivated, at least in part, by the purpose of serving the interests of UVH.

230. UVH is liable under the doctrine of respondeat superior for the damage caused by these negligent acts.

## EIGHTH CAUSE OF ACTION
### Wrongful Death (Utah Code Ann. § 78B-3-106) Against All Defendants

231. Plaintiff adopts and re-alleges all preceding allegations.

232. As complained of herein, Decedent's death was caused by the wrongful acts or negligence of Defendants.

233. Provo Employee Defendants acted or failed to act through willful misconduct.

234. Plaintiff, as Personal Representative of the Estate of Jason Todd Mace, maintains an action of wrongful death against Defendants for the benefit of the heirs of Jason Todd Mace (the "Heirs").

235. As a direct and proximate result of Defendant's wrongful acts or negligence, the Heirs have suffered, in an amount to be determined at trial, a loss of affection, counsel, and advice; a loss of the Decedent's care and solicitude for their welfare; a loss of comfort and pleasure; and a loss of financial support.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as proven at trial, including but not limited to:

a. For all damages that Plaintiff, on behalf of the heirs and as Personal Representative of the Estate of Jason Todd Mace, is entitled to and that are reasonable in the circumstances.

b. Economic damages in the amount of $13,622.55 for funeral expenses and other medical costs;

c. Economic damages for loss of income in such amounts as will be proven at trial;

d. For non-economic damages specifically for the pain and suffering that Decedent experienced from the time of Defendants' wrongdoing to the time of his death.

e. For non-economic damages for the Heirs in such amounts as will be proven at trial;

f. For reasonable attorneys' fees and experts' fees pursuant to 42 U.S.C. § 1988;

g. For pre- and post- judgment interest;

h. For punitive damages because Defendants' actions were the result of a reckless and callous nature, a willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of others; and

i. Such other and further relief as the court deems appropriate.

DATED this 10th day of March, 2023.

<div style="margin-left:40%">

HART & HART

 /s/    Jonathan D. Hart
CHRISTOPHER R. HART
JONATHAN D. HART
Attorneys for Petitioner

</div>