IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

In re:                          )
                                )
GAYLENE DAVIS                   )
individually, on behalf         )
of the heirs and as            )
Personal Representative         )
of the Estate of Jason         )
Todd Mace, et al.,             )
                                )
        Plaintiffs,            )
                                )
vs.                            )   Case No. 2:22-CV-00629
                                )
PROVO CITY, et al,             )
                                )
        Defendants.            )
                                )
_____  )

BEFORE THE HONORABLE DAVID BARLOW

August 30, 2023

Court's Ruling

**Appearances of Counsel:**

For the Plaintiff:      Jonathan D. Hart
                  Christopher R. Hart
                  Attorneys at Law
                  Hart & Hart
                  631 North 300 West
                  Salt Lake City, Utah 84103

For Provo City:        William S. Helfand
                  Attorney at Law
                  Lewis Brisbois Bisgaard & Smith
                  24 Greenway Plaza
                  Suite 1400
                  Houston, Texas  77046

                  Patrick Robert Charest
                  Attorney at Law
                  Lewis Brisbois Bisgaard & Smith
                  6550 S. Millrock Drive
                  Suite 200
                  Salt Lake City, Utah 84094

Court Reporter:

Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)201-9731

**(Court's Ruling)**

THE COURT: All right. We're reconvened in *Davis versus Provo City, et al.* I've taken an opportunity during this break to reflect further on the arguments that counsel made during our hearing today. And as I said, I made extensive notes coming into this hearing to prepare for it. And I think what's actually going to be best here, there are a lot of issues, a lot of claims, a lot of issues, a lot of case law, a fair number of factual allegations in the complaint, but I think it is going to be best if I give you an oral ruling on the motion today so that you can have the benefit of that result. And partly, I think maybe I'll just note right here at the outset, this is longer -- this is a longer oral ruling than I would typically give just because there are so many moving parts, as I indicated, but both counsel have demonstrated in their briefing and today, a high degree of mastery both of the alleged facts in the cases before the court as well as the case law as well.

So I think what this will do by doing this today instead of making you wait on my schedule to write this order, is you will be able to start to move forward in whichever way seems best to you. That's going to benefit you and I am going to go ahead and preview now having had a chance to reflect on your arguments that my ruling is not

3

going to dismiss the case entire, and the parts that it is going to dismiss will be without prejudice, so there will be an opportunity for plaintiff to amend the pleading and then an opportunity for the defendants to re-move for dismissal should they do so. And that makes me think that it's right for me to give you this ruling right now so that you will have the benefit of that, you can move on and this case can advance.

Let's start with the standard. On a 12(b)(6), it is known to all, it has been referenced by both sides in this hearing *Iqbal* and *Twombly*. The complaint must contain sufficient factual matter which the court accepts as true to "state a claim that is plausible on its face." And the court, of course, does not accept legal characterizations or conclusory statements that are unsupported by factual allegations. The court also, in addition to accepting all factual allegations as true, will make reasonable inferences in the favor -- in favor of the nonmoving party.

All right. The motion to dismiss has the following components. The 1983 claims and the wrongful death claim against the officers involving qualified immunity. So there is the QI issue. The supervisory and municipal liability claims, the unnecessary rigor claim, and then the wrongful death claim. And I'm going to address those issues in that order.

4

First, on qualified immunity, the doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.  That's the *Hernandez* case, 2017.  It protects all but the plainly incompetent or those who knowingly violate the law.  That's the *Mullenix* case, 2015.

Now, and as counsel for the defendants pointed out in oral argument, once a defendant asserts qualified immunity, the onus is on the plaintiff to demonstrate that the official violated statutory or constitutional right and that the right was clearly established at the time of the challenged conduct.  That's the *Surat* case, Tenth Circuit, 2022.

To demonstrate that the law is clearly established, the party opposing qualified immunity must either identify an on-point Supreme Court or published Tenth Circuit opinion, or show that the clearly established weight of authority from other courts has found the law to be as the party maintains.  That's most recently the *Valdez* case from the Tenth Circuit this year.

But a case need not be directly on point. Existing precedent, however, must have placed it, the question that is, the statutory or constitutional question, beyond debate.  And again, that's the *Mullenix* case from the

Supreme Court.  The dispositive question for the court is whether the violative nature of particular conduct is clearly established, which means the courts may not define a clearly established right or law at a high degree of generality.  That's the *Crane* case and many others from the Tenth Circuit.

Finally, the Supreme Court teaches in *Wesby* that it is not enough that the rule is suggested by then existing precedent, the precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.

All right.  This means that a reasonable officer, of course, has got to know that his or her conduct is unlawful in the situation that he or she confronted.

Ms. Davis asserts that she has identified two applicable clearly established rights under the Eighth Amendment.  First, she argues that the officers deliberately ignored Mr. Mace's serious medical needs when he had obvious symptoms of intoxication and a substantial risk of suicide.  And then secondly, that the officers abdicated their gatekeeper role.

Let's talk about those issues here.  In the *Quintana* case, which both sides referenced at some point in their briefing or in oral argument, the Tenth Circuit held as follows:  Prior to January 2016, it was clearly

established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates detainee's constitutional rights. And, of course, delay of care can also constitute a violation of a detainee's rights. That's the *Estelle* case.

A medical need is sufficiently serious if it's one that's been diagnosed by a physician, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. The *Mata* case again that both sides referenced.

Regarding that gatekeeping function, the Tenth Circuit has held in *Burke versus Regalado* that if the official knows his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, he may be liable for deliberate indifference.

Now as the defense counsel has pointed out repeatedly in briefing and in oral argument today, facts of this case show that Mr. Mace did receive medical attention. The question is whether plaintiff has plausibly alleged in the complaint, the amended complaint, that an officer would easily recognize that Mr. Mace obviously needed medical attention sooner, or whether medical -- or whether officers were deliberately withholding from the medical professionals

7

information that they knew was needed.

To determine this, the court reviews the well-pled allegations of the complaint.  So your briefing has been helpful guides but I don't take any factual averments that are made in that briefing or in oral argument here today.  And I found it most helpful, as I was reviewing the complaint and thinking about what the allegations of the complaint show and do not show regarding those officers, to group them into the two supervising officers and then the three officers that accompanied Mr. Mace to the hospital.

Starting with Officer Grow, she allegedly knew that Mr. Mace had said, "no one cares" before taking a "handful of pills," that the pills included trazodone, an antidepressant, an anti-anxiety medication, and quetiapine. That Mr. Mace had prematurely left a rehabilitation program, that he had been drinking before he took the pills, that a drug dealer had visited Mr. Mace, and that Mr. Mace was agitated, emotional, belligerent, and had vomited, and that another officer was considering that Mr. Mace might be experiencing an overdose in the back of the police car.

Now, these are the allegations in the complaint. The fact that I have referenced them here doesn't mean that I find any one of them to be dispositive or even necessarily important.  Those are the relevant allegations as to Officer Grow.  She also is alleged not to have told the other

officers what she heard about the specific pills that Mr. Mace had taken and did not search for overdose evidence.

She also declined the EMT's offer of on-the-spot medical assistance but instead ordered Officers Miguel, Dore, and Mahoney to take Mr. Mace to the hospital, in part, quote, "because he took those pills." Officer Grow did not go to the hospital himself or take additional steps to ensure that his subordinates got Mr. Mace medical treatment.

Officer Whatcott, the other supervisor on scene. We have generally the same allegations about what Officer Whatcott knew, but there is -- we don't have an allegation that Officer Whatcott was told about Mr. Mace's drinking. There is also an allegation that in response to a question about what was being done regarding the pills that Mr. Mace had taken, that Officer Whatcott told plaintiff that Mr. Mace was on his way to the hospital now.

So considering the facts that have been alleged regarding Officers Grow and Whatcott, in making reasonable inferences in favor of plaintiff, the court finds that the facts are insufficient to state a plausible claims against these two officers. Plaintiff doesn't cite any case and I'm not aware of any where an official instructed subordinates to take a detainee to a hospital, but was found to have been deliberately indifferent, either as a gatekeeper or otherwise.

Of course, the complaint also alleges that those two officers declined on-the-spot medical assessment by EMT -- by EMTs. But the gatekeeper cases in this circuit, cases like *Sealock*, *Mata*, *Burke*, *Quintana*, all involve outright refusals to provide or obtain medical care, delays of many hours in the face of obvious, serious, and urgent medical needs. Plaintiff hasn't cited any basis in the case law that would allow the court to find that if officials decline EMT assistance in favor of sending someone to the hospital, especially sending them as quickly as they did here, that it would be clear to a reasonable officer that his conduct was unlawful in a situation that he confronted.

Nor do the fact allegations that are before the court here suggest that there was any other deliberate indifference on Officer Grow or Officer Whatcott's part. Officers encounter chemically intoxicated individuals all of the time, it's an ordinary and a normal part of the work that they do. And so, as the Tenth Circuit has found in other cases, the fact that an individual appears intoxicated, has vomited, is agitated, emotional or belligerent, it is not only not unusual, those things are not enough to meet the required standard which is that the serious medical need is obvious such that even a lay person would easily recognize the necessity of a doctor's attention.

As counsel for the defendants has argued, the standard here is not negligence. It is not about best practices, it is not about everything that might have been done or would have been good to have done whether in foresight or hindsight. So the allegations that the officers failed to search for overdose evidence but didn't, or failed to tell other officers the names of the medications that Mr. Mace might have taken but didn't, or didn't take additional steps to ensure that inferior officers were executing orders that the superiors had given, they don't make plausible a claim for deliberate indifference.

The allegation also that Officer Grow knew that Mr. Mace had prematurely left an unidentified rehabilitation program does not change the analysis. There are no other facts alleged around it. I'm not stating that if there were that it would change the analysis, just the fact that that officer was told that he had prematurely left a rehabilitation program doesn't change the court's analysis in any way.

The complaint makes it clear that Mr. Mace was taken into custody at 1:10 a.m., that Officer Grow instructed the subordinate officers to take Mr. Mace to the hospital because he took those pills and because of the fight. And that Officer Whatcott clearly was aware that

11

Mr. Mace was on his way to the hospital.  Mr. Mace got there around 1:25, about 15 minutes after he was taken into custody as defense counsel pointed out.

Now, I don't know what the delta is in terms of how long it took to get there, but the point is he was taken into custody, he is at the hospital 15 minutes later.  There are no cases suggesting that that period of time is something which should be concerning.

In fact, I would say that the allegations of the complaint make it pretty clear that Officers Grow and Whatcott were not deliberately indifferent.  They took him to the -- they told the other officers to take him to the hospital, they sent them there promptly, and he got there promptly.

So the complaint's fact allegations do not state a plausible claim of deliberate indifference either on its own or whether framed as a gatekeeper claim against these two supervisory officers.

That takes us then to Officers Miguel, Dore, and Mahoney.  And again, I'm going to recite the allegations regarding these officers that got my attention even though not all of them are -- are important to the analysis, they are interesting context.

Officer Miguel was allegedly told that Mr. Mace was drunk, that he took a handful of pills, declined the EMT

12

assistance, was aware that Mr. Mace had vomited, heard Officer Mahoney's concern that Mr. Mace might have overdosed, and he took Mr. Mace to the hospital.

At the hospital, Officer Miguel allegedly only requested medical evaluation for Mr. Mace's minor injuries from his fight with his brother. Observed, Mr. Mace vomit and fall asleep and deliberately did not tell medical staff that Mr. Mace had taken a handful of pills.

Officer Dore was told the same things about Mr. Mace at the residence that Officer Miguel was told and generally knew and did similar things except that she knew about the early rehabilitation exit, which I told you earlier doesn't effect the court's analysis, she allegedly knew that a known drug dealer had visited Mr. Mace, and she saw that Mr. Mace's back was soiled in sweat. Again, something that the court does not find to be important. Officer Dore also allegedly told the family that it was obvious that Mr. Mace was on something.

Officer Dore's conduct at the hospital is also alleged to be generally the same as Officer Miguels in that there was a request only for a medical evaluation for Mr. Mace's minor injuries from the fight with the brother, and that nothing was said to the medical staff about Mr. Mace having taken a handful of pills. She also didn't say anything about the drug dealer and is alleged to have

13

reviewed the medical clearance form, et cetera.

Takes us to Officer Mahoney. Officer Mahoney was told at the residence that Mr. Mace had taken a bunch of pills and allegedly expressed concern that Mr. Mace was overdosing. And like the others, allegedly failed to present Mr. Mace to the EMTs. The hospital again only requested medical eval for the minor fight injuries, and is alleged to have deliberately not told medical staff that Mr. Mace had taken a bunch of pills, also observed Mr. Mace vomiting.

There is a further allegation that Officer Mahoney dishonestly told the jail nurse that Mr. Mace was walking under his own power at the hospital and denied that the family had said anything about him taking drugs. The complaint also asserts that the nurse said, or that he told the nurse rather, that quote, "we didn't hear anything about medicals, it was just a fight," close quote, while Officer Dore, hearing that comment, remained silent. And this allegedly occurred around the time or during the time that Mr. Mace was having seizures.

So in sum, the facts alleged about these three officers that took Mr. Mace to the hospital are materially different than the allegations that are made about the supervising officers. And most important among them for Officer Miguel is the allegation that he deliberately,

14

intentionally, not accidently, not negligently but intentionally, chose not to tell medical personnel about the handful or the bunch of pills that he heard Mr. Mace had ingested. And after all, his supervising officer had sent him to take Mr. Mace to the hospital in part because he took those pills.

Same is true for Officers Dore and Mahoney, but we have additional allegations at the jail sallyport namely that those two -- well, that Officer Mahoney dishonestly told the jail nurse that Mr. Mace was walking under his own power and told the nurse that they hadn't heard anything about medicals, it was just a fight, while Officer Dore heard that and stayed silent.

Now, the experienced counsel that are before me don't probably need to hear me make this clear but I'm going to do it any way. I'm not making findings of fact here, I'm telling you what is in the allegations of the complaint and that is what we deal with for purposes of a motion to dismiss. This is maybe not a bad time to also note that while qualified immunity motions can be brought at a motion to dismiss stage, nothing improper about that, they obviously operate under a different standard there than they do at the summary judgment stage where we have a fleshed out medical record. In any event, taking those allegations together, the factual allegations of the complaint which the

15

court treats as true at this stage of the litigation, together with reasonable inferences in favor of the plaintiff, are enough to state a plausible claim for deliberate indifference or failure under the gatekeeper standard. The difference here is these allegations, the way they're stated in the complaint, are not simply that the officers might have done more or they should have done more, that they forgot to say something and just didn't do it, that they may have done a better job. Instead, the allegation is that these officers intentionally chose to withhold information which they believed to be important to the medical personnel, and two of them allegedly made affirmatively false statements. So there is your difference.

As I noted, the Tenth Circuit has said in the *Quintana* case that prior to January 2016, which is early enough for this case, it was clearly established that when a detainee has obvious serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights. Took him to the hospital, true, but based on that language in *Quintana*, at least at the motion to dismiss stage and making the inferences in favor of the plaintiffs, it seems that their factual allegations are likely sufficient to show that those individuals may have known of an obvious and serious medical need having been directed by

their CO to take him to the hospital for that purpose in part, and then did not do the necessary parts so that medical personnel would know what they were looking for.

All right. Of particular moment I think, not to belabor it, are the allegations of intentional dishonesty in this process. That's what separates it out, that's what makes it different, that's what makes it distinct. Regarding that, the intentionality of it, and that is alleged in the complaint. It was even referenced, not that I'm going to hold you to it, counsel, but the distinction between in argument between not doing enough, not being as good as you might have been, not understanding what's going on and lies. The complaint -- the complaint alleges some lies and that's where we sit today.

Regarding supervisory liability, we have Supervising Officers Whatcott and Grow. And in *Valdez,* the Tenth Circuit instructs as follows. There must be an affirmative link between the supervisor and the violation. It has got to include three things. Personal involvement, a sufficient causal connection, and a culpable state of mind. That first element about affirmative link involves -- well, the link is to be between the supervisor's personal participation in his exercise of control or discretion or failure to supervise and the constitutional deprivation. I am citing there the *Arnold* case from last year. A

17

supervisor must have more than abstract authority, must be a deliberate intentional act by the supervisor to violate constitutional rights. That's *Hinkle*, Tenth Circuit, 2020. Plaintiffs have also got to show that the alleged actions caused the constitutional violation by setting in motion a series of events that the defendant knew or should have known would cause others to deprive the plaintiff of constitutional rights. That's *Burke*, Tenth Circuit, 2019. And finally, the supervisor must act knowingly with deliberate indifference that a constitutional violation would occur. That's *Dodds*, Tenth Circuit, 2010.

And the Tenth Circuit instructed lower courts in the *Schneider* case that this is a stringent standard of fault requiring proof that an actor disregarded a known or obvious consequence of his action. So I have already noted that the allegations of the complaint do not plausibly allege deliberate indifference for Officers Grow and Whatcott, and nor does it plausibly allege that their involvement caused the constitutional deprivation that is alleged here. Saying that they might have done more to see that their orders were effectuated is not a legal standard for the issue that the court is considering here, nor no case law says and there is no reason that these officers would have had to believe, based on the factual allegations of the complaint, that their orders were not going to be

followed.

Plaintiff also alleges that those two officers maintained, implemented, or promulgated an unconstitutional custom, informal policy, or regulation of ignoring overdose reports, failing to treat indications of overdose seriously or treating medical clearances as an objective in itself.

Now, I'm going to start by saying that I don't believe there are any allegations that those two supervisory officers are policymakers for the municipality and so there is that issue there. I don't know that that was briefed, it was just an observation by the court. In any event, the allegations regarding any unconstitutional custom, policy, or regulation of ignoring overdose reports or treating medical clearance in a way that was purely perfunctory I find to be conclusory. They're insufficient to meet the plausibility standard here. The Tenth Circuit in *Nielander,* by the way, addressed this issue of a single incident of unconstitutional conduct noting that a plaintiff must show that the incident resulted from an existing unconstitutional policy. It has got to be grounded upon patterns of abuses as the court said in *Brown.* Ms. Davis doesn't allege anything more than the supervising officers actions regarding Mr. Mace and this is insufficient here. The causal connection is conclusory pled as well. There is no reason to believe that Officers Grow and Whatcott thought

that their order was not going to be executed, which they instructed the officers to do, namely to take Mr. Mace to the hospital for two reasons. And it's not enough to assert that the supervising officers, you know, went about their business as the complaint says. There is nothing wrong with that, there is no reason why that would have caused them to be deliberately indifferent, that's how chain of command works.

Plaintiff also asserts that the supervising officers exhibited deliberate indifference when they willfully chose not to have EMTs treat Mr. Mace. I have already addressed that issue. There is no case law with which the court has any familiarity indicating that you need to send individuals to an EMT when instead you're choosing to send them to the hospital, or any reason to believe that the EMTs would have been helpful to Mr. Mace in a way that the emergency room personnel were not within 15 minutes. So, for all of those reasons the supervisory liability cause of action is dismissed.

This takes us to municipal liability. Regarding that claim, we have discussed, in brief, the *Monell* case in the hearing today and the court there made it clear that *Monell* liability may not attach solely because a municipality has employed a tortfeasor. The Tenth Circuit's 2020 decision in *Jensen*, which was reaffirmed in *Lance* in

2021 and *Valdez* just this year, found that to establish municipal liability a plaintiff must allege the existence of a municipal policy or custom, a direct causal link between that policy and custom and the injury alleged, and if the policy consists of the failure to act, that the inaction was the result of deliberate indifference to the rights of its detainees.

Now, the Tenth Circuit has fairly recently also adopted, and I don't believe the parties discussed it in their briefing, a three-part test in part three of the three-part test. They imported the three-part test from *Walker,* Second Circuit decision, to help the court determine whether deliberate indifference has been adequately pled.

Like I said, I don't know that we have had adequate briefing on that issue. In the *Murphy* case, the Tenth Circuit instructed that cities may incur liability when they have longstanding practices or customs that become standard operating procedure. It has got to involve widespread practice and be so permanent and well settled that it constitutes custom or usage for the force of law.

We don't have that here. I am going to explain why after I say one more thing about *Valdez*. It instructs that the city may be liable when the need for more or different training is so obvious and its inadequacy is so likely to cause a violation of constitutional rights, that

21

then the court might infer that the policymakers of the city can be said to have been deliberately indifferent to that need. And then the *Waller* decision provides additional guidance for the court. Ultimately it has got to be highly predictable and patently obvious.

Plaintiff briefs this in significant detail and we discussed it in some detail in our hearing today. There is really three ways that the plaintiff has alleged that this standard is met here. First, inadequate training and supervision of CIT members. Plaintiff says that lack of training here utterly failed to ensure treatment for Mr. Mace's obvious mental illness and report to the substantial risk of suicide and then alleges the city had constructive knowledge of that. But I find that the amended complaint does not plausibly allege a widespread pattern of constitutional violations, just conclusory statements that there was inadequate treatment and supervision of members in CIT and it resulted in deficient treatment for individuals at risk for suicide. The one incident pled is not enough.

Since there is no alleged pattern to be actionable, the one incident would have to fall into the narrow range of circumstances where the risks of constitutional violations are patently obvious. Officers Dore and Miguel were members of the CIT team, they received training and certification about how to assist those who are

22

suffering from mental illness, that's acknowledged in the complaint, but that Ms. Davis alleges that the city inadequately trained and supervised them but it's just a conclusory allegation. It can't reason backward from what happened in this case to determine that it must mean there is a plausible allegation that the training standards were insufficient indeed. I don't believe there are any allegations or any legal basis for the court, based on what I have before me now, to conclude that the city had some duty to put people through CIT training or how it would have made a difference here, in addition, to the other allegations that I have identified.

In fact, I might say that based on how I have read and understood the complaint it seems that the complaint's thrust is that a number of officers knew that they possessed information that was critical to the medical team and for some unknown reason intentionally chose not to tell the medical team what they knew about the individual, namely that he had taken a handful of pills and might be trying to kill himself. That's not the sort of thing that -- that doesn't gel well with the argument that the CIT training is somehow deficient.

All right. This takes us to informal custom of ignoring overdose as a serious medical need. We have got that allegation, we have got the incident that has been

discussed both in the briefing and in oral argument today about a 2009 incident in another case. But that 2009 case, a death that resulted after officers allegedly failed to help an individual suspected of overdose, is not enough. Notice can be established through a pattern of tortious conduct, that's the *Finch* case from last year, Tenth Circuit. A single event is not a pattern. One incident might be enough if it is high -- if it signifies a highly predictable and plainly obvious consequence of a municipalities action or inaction. But no court has found officers liable for that 2009 incident. So even that one event, even if the factual predicate were incredibly similar to this case, I'm not making that finding but if it were, it wouldn't be enough to set up a clear warning that the city requires. So it's not enough to form a basis of liability against them. This takes us to the regulation policy or informal custom about medical clearances and alleged inadequate training or supervision of officers.

Now, it seems like the focal point here is Officer Grow's statement about Mr. Mace's medical clearance. She said, allegedly, our protocol was to get that clearance just hearing the traffic over the air I'm like okay they're done with the clearance, going down to the jail, all is groovy now.

In plaintiff's view, the city then had notice

that its policy or lack of training was substantially certain to result in constitutional violations. But assuming that the city's policy was in fact deficient, a finding that the court does not make here, Ms. Davis must still show that the policy caused the injury, that causal connection is required and it is critical. She fails to plead it. Officer Grow directed her subordinates, these subordinates, I think Officer Grow is male, not female, am I correct about that, counsel, for the defense? My apologies for the confusion. Officer Grow directed subordinates to take Mr. Mace to the hospital for the medical clearance for two reasons, because he had gotten into a fight and sustained some injuries, and because officers were told that he took those pills. That's what the complaint says. Any municipal policy allegedly carried out by Officers Whatcott and Grow, whether inadequate or not, could not plausibly cause the injury. Mr. Mace arrived at the hospital for evaluation 15 minutes after they took officer's into custody. So that claim is not plausible and the amended complaint, for the reasons previously stated, does not state a 1983 claim against the city or its policymakers for municipal liability.

This takes us to the two state law claims, unnecessary rigor. Under the Utah Constitution, persons arrested or imprisoned shall not be treated with unnecessary

rigor. Utah Supreme Court has said that's a guarantee against unnecessarily rigorous treatment which protects prisoners and arrestees against unnecessary abuse and that it includes things that are needlessly harsh, degrading, or dehumanizing the treatment of prisoners. That's the *Dexter* case, 2008. That particular constitutional clause is focused on the circumstances and nature of the process and conditions of confinement. That's the *Rodriguez* case, Tenth Circuit, 2022. And when the claim of unnecessary rigor arises from an injury, a constitutional violation may only be made out if there is a substantial risk of serious injury for which there was no reasonable justification at the time.

This brings us to *Ostler* and *Stella.* The parties understand these two cases differently in terms of what they stood for. In *Ostler,* plaintiffs argued that they could bring a wrongful death claim for alleged violations of the deceased constitutional rights, the deceased's rights. And the court reasoned that the law had closed the door the plaintiffs sought to open because allowing their claims to enter through a backdoor in provisions for unnecessary rigor based on another's constitutional rights would undermine Utah's legislature and its highest court.

And so, the court there found that the unnecessary rigor claims were held by the decedent alone. Then there is the *Stella* case just from last year from this

26

court noting that a plaintiff asserting a claim for unnecessary rigor must show that he or she suffered a flagrant violation of his or her constitutional rights. And the court reasoned that the plain language of that condition required that it would be the plaintiff, him or herself, that directly suffered the constitutional violation in bringing the claim. There's an argument that the plaintiffs have made seeking to distinguish *Stella,* in particular, noting that unlike *Stella*, she purports to bring a separate wrongful death action on behalf of Mr. Mace's estate, but the court finds that those two cases together with other language from the Utah Supreme Court is sufficient for the court to conclude that it should not be recognizing an unnecessary rigor case in this on the facts of this case as they stand now.

So, for example, the Utah Supreme Court even though it hasn't decided the issue has stated that a plaintiff must establish that he or she suffer a flagrant violation of his or her constitutional rights using the same verbiage that was noted in the *Ostler* and stellar -- and *Stella,* rather, case -- cases that have been cited. So the court is going to find those cases to be persuasive and follow them.

Court does acknowledge Ms. Davis's policy argument regarding a practical potential effect of those --

27

of a determination that the estate can't bring the claim, but the court can't embrace a public policy consideration to ignore plain language. And under Article 1, Section 9, as multiple courts have recognized, persons arrested or imprisoned shall not be treated with unnecessary rigor. The Utah Constitution does not explicitly create a cause of action for an estate alleging violation of a prisoner or detainee's rights to be free from unnecessary rigor.

Finally, the *Spackman* case the Utah Supreme Court found that to ensure the damage actions arise only under appropriate circumstances, we therefore hold that the plaintiff must establish that he or she suffered a flagrant violation of his or her constitutional rights. In the end, Ms. Davis cites no case law to support her position. Her argument is based more on distinguishing the cases which some of the cases which the court has identified. Court asserts it as well and cannot find any cases that support her position there so she fails to state a claim for which relief can be granted.

This brings us finally to wrongful death. Plaintiff has conceded at oral argument that the UGIA applies to Provo City on the wrongful death action and so that claim against Provo City will be dismissed.

Now, defendants also argue that the individual law officers are protected by -- they're protected by

28

qualified immunity. I have found that plausible claim for deliberate indifference involving three of the Officers Miguel, Dore and Mahoney. Defendants did not brief what effect that finding would have on the individual officers' UGIA defense for a wrongful death. So we save it for another day.

For her part, plaintiff did not substantively address that wrongful death claim outside of the unnecessary rigor discussion. Defendants have the burden, of course, as the movant, and I find that they failed to carry it as it applies to those three officers for the wrongful death claim. So it denies the motion as to them while granting it to Officers Grow and Whatcott as well as to Provo City.

So here's where this leaves us, counsel. I am granting in part and denying in part the City's motion to dismiss the amended complaint for failure to state a claim. First cause of action is dismissed as to Officers Grow and Whatcott. Second, third, and fourth causes of action are dismissed in their entirety. And the eighth cause of action is dismissed as to Provo City and Officers Grow and Whatcott.

As I foreshadowed at the beginning of the ruling, this dismissal is without prejudice in its entirety. If the plaintiff wishes to do so, she may seek leave to amend her pleading within 60 days. That motion for leave will be

granted, but I want you to go through the process that we have under the local rule of identifying changes that you made to the complaint should you choose to do so.

And then after the plaintiff has made any amendments to the complaint, the defendants will then be permitted to move to dismiss the amended complaint in whole or in part based on how they see things standing at that point.

With that, counsel, let me ask you whether you have any questions for me about next steps, about how we're to proceed at this point. I'll start with the movants counsel.

MR. HELFAND: I have a question, I'm not sure it is a question that the court can answer.

THE COURT: Ask and we'll find out.

MR. HELFAND: Indeed. As the court knows, the denial of the claim of immunity is interlocutory appealable under the collateral order rule and I'm just going to have to sort for myself unless there -- unless we can come up with maybe perhaps plaintiff's counsel and I can craft a stipulation depending upon and I don't even know whether plaintiffs intend to amend to try to state a claim against the City or Officers Grow or Whatcott at this point because what I don't want to do is miss the limited window within which to take that interlocutory appeal while we're waiting

30

for an amended complaint. So --

THE COURT: Yeah.

MR. HELFAND: -- I guess I'm not asking a question as much as I want to make clear to the court that I may find I have to take that interlocutory appeal before there is an opportunity to amend. I just don't know the answer to that.

And again, some of that I'm not putting plaintiffs counsel on the spot right now, they'll need time to think about it, maybe whether we come up with a stipulation that preserves that opportunity.

THE COURT: Okay. Thank you for that, counsel. You're right, I don't have much to say about it other than to note that it's certainly not the court's intention that any of its ruling today constitute a final order on any of the issues that are before it, but instead an opportunity for the plaintiffs to seek leave to replead and I'll leave that part there just so you know the court's intention.

MR. HELFAND: That may be helpful to the analysis. I appreciate the court's clarification.

THE COURT: You're most welcome.

MR. HELFAND: Otherwise, thank you for your time, Judge.

THE COURT: Of course. So this basically, the ruling today, gives plaintiffs freehand to replead as they

see fit, but then it gives the defense a free hand to urge any and all issues including anything that we have covered today in the next round of briefing. That's where things stand.

Mr. Hart, have you any questions on behalf of the plaintiff?

MR. J. HART: No, Your Honor.

THE COURT: Very well. Then that's where things stand. Counsel, would it be helpful to you if we set a time period for that next round of motion to dismiss briefing to come on the heels of an amended complaint? Should we set that timeframe now so that you'll know what you're looking at?

MR. HELFAND: I would appreciate that, Your Honor.

THE COURT: What do you think would be beneficial, counsel? How many days would you like after you have the amended complaint?

MR. HELFAND: I'm going to say 14 days, Judge, would be adequate.

THE COURT: Okay. I was going to give you 30, but if you want 14.

MR. HELFAND: Well, I'm speaking for someone else's work. So I --

THE COURT: I see. So you were speaking for your

colleague and you knew he would be fast.  Yeah.

MR. HELFAND:  I am.

THE COURT:  Why don't we make it 30.

MR. HELFAND:  Very well, Judge.  We'll take 30.
Thank you.

THE COURT:  Okay.  Thanks for that.  So
Mr. Helfand, Mr. Hart, thank you for your arguments today
and for your preparation for this hearing.  With that we
will stand in recess.

MR. HELFAND:  Thank you.

MR. J. HART:  Thank you.

THE COURT:  Recess.

(Court adjourned at 3:52 p.m.)

**REPORTER'S CERTIFICATE**


I, Laura W. Robinson, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public within and for the County of Salt Lake, State of Utah, do hereby certify:

That the foregoing proceedings were taken before me at the time and place set forth herein and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That the foregoing pages contain a true and correct transcription of my said shorthand notes so taken.

In witness whereof I have subscribed my name this 14th day of November, 2023.


*Laura W. Robinson*_____

Laura W. Robinson

RPR, FCRR, CSR, CP